IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CHAMPION PRO CONSULTING GROUP, INC., and CARL E. CAREY, JR., Ph.D., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:12CV27 |
| IMPACT SPORTS FOOTBALL, LLC, MITCHELL FRANKEL, TONY FLEMING, ROBERT QUINN, CHRISTINA WHITE, and MARVIN AUSTIN, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Presently before the court is Defendants' Motion to Dismiss the Amended Complaint (Doc. 31).  Defendants have filed a memorandum ("Defs.' Mem.") (Doc. 32) in support of their motion, Plaintiffs have filed a response in opposition ("Pls.' Resp.") (Doc. 34), and Defendants have filed their reply (Doc. 37). Defendants' motion to dismiss is now ripe for adjudication, and

for the reasons that follow, this court will grant the motion in part and deny the motion in part.[1]

**I.    BACKGROUND**

This lawsuit arises from the representation of and contract negotiation for Robert Quinn ("Quinn"), the fourteenth overall pick in the 2011 NFL Draft.  The following allegations are taken from the Amended Complaint (Doc. 17).

At all relevant times, Plaintiff Carl E. Carey Jr., Ph.D. ("Plaintiff Carey"), was a certified National Football League Players Association ("NFLPA") contract advisor.  (First Am. Compl. (Doc. 17) ¶ 12.)  He became a certified agent in 2005 for the sole purpose of trying to enhance young athletes' lives and careers through proper and ethical representation and guidance. (Id. ¶ 13.)  Plaintiff Champion Pro Consulting Group, Inc. ("Plaintiff Champion") is a management consulting company that specializes in the representation of professional football players.  (Id. ¶ 14.)  Plaintiff Carey served as president of Plaintiff Champion.  (Id. ¶ 3.)

Defendant Impact Sports Football, LLC ("Defendant Impact") is a Florida limited liability company with its principal place

---

[1] Also pending before this court is Plaintiffs' motion to strike (Doc. 33).  That motion is addressed by a separate order. This motion has been decided in conformity with this court's decision as to the motion to strike.

-2-

of business in Boca Raton, Florida. (Id. ¶ 4.) Defendant Impact employed Defendant Tony Fleming ("Defendant Fleming") as a player-agent representative. (Id. ¶ 6.) Defendant Mitchell Frankel ("Defendant Frankel") was also a registered player-agent representative as well as an active officer and registered agent for Defendant Impact with direct and supervisory authority over Defendant Fleming. (Id. ¶ 5.) Defendant Christina White ("Defendant White"), Quinn's business manager, and Defendant Marvin Austin ("Defendant Austin") acted in concert with the other Defendants. (Id. ¶¶ 8-9.) Defendant Austin received monetary compensation for recruiting potential clients for Defendants Impact, Frankel, and Fleming. (Id. ¶ 84.)

A mutual friend introduced Plaintiff Carey to Quinn in November 2010. (Id. ¶ 19) Soon after, Quinn called Plaintiff Carey, and they had an introductory conversation. (Id. ¶ 21.) That conversation was the only contact between Plaintiff Carey and Quinn until December 4, 2010. (Id.) Plaintiff Carey also had a conversation with Quinn's father in November regarding Quinn. (Id. ¶ 22.)

On or about December 4, 2010, Plaintiff Carey met with Quinn and several members of his family in North Carolina. (Id. ¶ 23.) At that meeting, Quinn and his father signed a Standard Representation Agreement ("SRA") with Plaintiff Carey. (Id.)

-3-

The NFLPA requires the use of an SRA to memorialize the agreement between a player and player-agent representative for services to be provided in exchange for a commission on a player's contract. (Id. ¶ 24.) Based on this SRA, Carey was to receive a three percent commission on the value of Quinn's future contract. (Id. ¶ 25.)

Plaintiff Carey and Quinn also agreed to a separate contract for personal expenses. (Id. ¶ 26.) Under that contract, Plaintiff Carey would provide Quinn with money for personal expenses on the condition that Quinn repay the money if he terminated Carey within two years of the agreement. (Id.) If Quinn terminated the contract, the money he owed would revert to a loan. (Id.)

Throughout the following months Plaintiffs expended substantial time, effort, and money presenting Quinn in the best possible light, prepared him both physically and mentally for the NFL Draft, and performed various other personal services. (See id. ¶¶ 27-28, 30-31, 33-35, 37-38, 42.) In large part because of these efforts, Quinn was selected fourteenth overall in the 2011 NFL Draft. (Id. ¶ 43.) Plaintiff Carey also facilitated and arranged agreements for Quinn with Nike and trading card companies. (Id. ¶¶ 47-48.) He continued to

-4-

perform personal services for Quinn, as well as his friends and family, after Quinn moved to St. Louis.  (See id. ¶¶ 64-66.)

Because team owners and the NFLPA could not agree on a new collective bargaining agreement, NFL players were locked out from March 11 to July 25, 2011.  (Id. ¶ 49.)  As a result of the lockout, the NFLPA decertified as a union.  (Id. ¶ 50.)  During this period the NFLPA did not serve as a governing body over player representatives.  (Id.)

When in effect, the NFLPA's rules prohibited agents from contacting or communicating with a player under contract with another agent.  (Id. ¶ 51.)  On or about March 11, 2011, the NFLPA sent out a memorandum stating that it was "discontinuing its agent regulation system" as a result of its decertification. (Id. ¶ 53.)  Without the NFLPA's agent regulation rules in place, a number of agents began to contact and communicate with players under existing contracts with other agents.  (Id. ¶ 52.)

Under the expired collective bargaining agreement, the NFLPA's arbitration procedure provided the exclusive method for resolving disputes among contract advisors regarding alleged inference with the contractual relationship of an advisor and a player.  (Id. ¶ 55.)  However, mandatory arbitration did not apply to actions arising during the NFLPA's decertification. (Id. ¶¶ 56-57.)

-5-

Between December 4, 2010 and May 2011, Quinn and Plaintiff Carey communicated on a daily basis, frequently through text messages.  (Id. ¶¶ 44-45.)  However, these communications started to decrease in May 2011.  (Id. ¶ 45.)

Plaintiff Carey met Defendant White for the first time at a party in South Carolina on or about April 28, 2011.  (Id. ¶ 40.) Defendant Austin introduced Quinn to Defendant White.  (Id. ¶ 41.)

In June 2011 Plaintiff Carey started receiving text messages from Quinn demanding more marketing contracts.  (Id. ¶ 58.)  Quinn and Defendant White requested an emergency meeting with Plaintiff Carey in Chapel Hill to address Quinn's demands.  (Id. ¶ 59.)  Other members of Quinn's family also attended the meeting.  (Id. ¶ 60.)  At the meeting, Defendant White was introduced as Quinn's business manager and girlfriend. (Id. ¶ 61.)  Quinn asked Plaintiff Carey to cut his commission from three percent of Quinn's professional contract to one and one-half percent.  (Id. ¶ 63.)  The Amended Complaint alleges that at the time Defendants Fleming and White knew each other and had an agreed upon plan and scheme to terminate the relationship between Plaintiff Carey and Quinn.  (Id. ¶ 62.)

On or about July 20, 2011, a trainer from the St. Louis Rams called Plaintiff Carey regarding Quinn.  (Id. ¶ 67.)  When

-6-

Plaintiff Carey informed Quinn of this call, Quinn terminated Plaintiff Carey as Quinn's player-agent representative. (Id. ¶ 68.) While terminating Plaintiff Carey, Quinn told him that Defendants Impact, Frankel, and Fleming had offered to pay Quinn $50,000 in addition to any amount Quinn owed Plaintiff Carey if he terminated his SRA with Plaintiff Carey and hired those Defendants. (Id. ¶ 73.)

According to the Amended Complaint, Defendants were "operating under a plan and scheme to terminate Carey immediately upon the beginning of any contact with the St. Louis Rams related to contract negotiations." (Id. ¶ 70.) Under this plan and scheme, Quinn was to remain under contract with Plaintiffs for as long as possible to extract as much money and as many services from Plaintiffs as possible before hiring Defendants as his agents. (Id. ¶¶ 71-72.)

Plaintiff Carey had prior experience with Defendants Frankel and Fleming from their attempts to sign student-athletes he had tutored. (Id. ¶ 75.) According to the Amended Complaint, Plaintiff Carey had witnessed unethical, illegal, and immoral business tactics and had expressed his concerns to student-athletes that Defendants Frankel and Fleming recruited. (Id.) Because he had expressed his concerns and recommended

-7-

that student-athletes not sign with Defendants Frankel and
Fleming, they targeted Plaintiff Carey for retaliation.  (Id.)

Defendant Fleming had informed Quinn and Defendant Austin
of his plans to form a sports agency and management company that
would cater to athletes interested in the partying lifestyle and
told them that they would be his primary clients.  (Id. ¶ 76.)

On July 20, 2011, Quinn told Plaintiff Carey that he would
make payments on their personal expense agreement.  (Id. ¶ 77.)
A few days later, Quinn agreed to be represented by Defendants
Impact, Frankel, and Fleming.  (Id. ¶ 78.)  The SRA was
terminable upon five days' notice.  Defendant Fleming discussed
contract terms with the St. Louis Rams within five days of
Plaintiff Carey receiving Quinn's fax terminating their SRA.
(Id. ¶ 79.)

On July 30, 2011, Quinn signed a four-year contract worth a
maximum of $9,400,000, including a $5,300,000 signing bonus.
(Id. ¶ 80.)  Based on the provisions of the 2011 NFL collective
bargaining agreement governing rookie contracts, little to no
negotiation would have been required.  (Id. ¶ 81.)

Before 2011, players rarely terminated representatives
after the draft but before negotiating with an NFL team.  (Id.
¶ 82.)  While the NFLPA was decertified, however, several former

-8-

UNC football players, including Quinn and Defendant Austin, did so.  (Id. ¶ 83.)

Defendants told Quinn that Carey was not properly representing him.  (Id. ¶ 85.)  Specifically, they told Quinn that Carey "should have been getting endorsement deals for Quinn"; that "Impact, Fleming, and Frankel could market Quinn better than Carey"; and that "Carey was at fault for Quinn not being selected higher in the 2011 NFL Draft."  (Id.)  As a result of these communications, Quinn terminated Plaintiff Carey as his player-agent representative and hired Defendants Impact, Frankel, and Fleming.  (Id. ¶ 86.)  Defendants knew that Plaintiff Carey and Quinn were bound by an SRA.  (Id. ¶ 87.)

## II.  LEGAL STANDARD

Defendants have moved to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In order for a claim to be facially plausible, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that

-9-

a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). When ruling on a Rule 12(b)(6) motion, a court must accept the complaint's factual allegations as true. Id. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Moreover, a 12(b)(6) motion can be granted in "the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." E.g., First Fin. Sav. Bank, Inc. v. Am. Bankers Ins. Co. of Fl., Inc., 699 F. Supp. 1158, 1161 (E.D.N.C. 1988); Lavender v. United Mine Workers of Am., 285 F. Supp. 869, 874 (S.D.W. Va. 1968) ("It is axiomatic that a complaint may be dismissed for failure to state a claim . . . .[when] the disclosure of facts . . . necessarily defeat[s] the claim.").

## III. ANALYSIS

Plaintiffs allege claims against all Defendants under the following legal theories: (1) unfair methods of competition, (2) tortious interference with contract, (3) slander per se, and (4) civil conspiracy. The Amended Complaint also includes a fifth claim for unjust enrichment against Defendants Impact, Frankel,

-10-

and Fleming.  Defendants move to dismiss each count on various grounds.[2]

**(1) Collateral Estoppel**

Before turning to the claims raised in the Amended Complaint, this court considers the extent to which collateral estoppel applies to the issues raised by those claims based on the NFLPA arbitration between Plaintiff Carey and Quinn.  (See Defs.' Mem., Ex. 1 (Doc. 32-1) (arbitration opinion and award).)  Under North Carolina law, parties seeking to collaterally estop relitigation of an issue must satisfy the following elements:

> (1) the issues must be the same as those involved in the prior action, (2) the issues must have been raised and actually litigated in the prior action, (3) the issues must have been material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action must have been necessary and essential to the resulting judgment.

---

[2] It is unclear from the Amended Complaint what conduct and harm allegedly occurred in North Carolina.  Because the parties appear to agree that North Carolina law governs, this court will apply North Carolina law in considering the motion to dismiss. A court need not address choice-of-law issues sua sponte.  See, e.g., Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 831 n.4 (10th Cir. 2005); In re Korean Air Lines Disaster of Sept. 1, 1983, 932 F.2d 1475, 1495 (D.C. Cir. 1991).

As to Plaintiffs' tort claims brought under North Carolina law, this court is bound to apply North Carolina law as to substantive issues and federal law as to procedural issues. E.g., Hanna v. Plumer, 380 U.S. 460, 465 ("[F]ederal courts sitting in diversity cases . . . are to apply state substantive law and federal procedural law.").

-11-

State v. Summers, 351 N.C. 620, 623, 528 S.E.2d 17, 20 (2000).

"Preclusive effect is not limited to court proceedings; it arises in the same manner from arbitration awards."  Whitlock v. Triangle Grading Contractors Dev., Inc., 205 N.C. App. 444, 448, 696 S.E.2d 543, 546 (2010); see also Murakami v. Wilmington Star News, Inc., 137 N.C. App. 357, 360, 528 S.E.2d 68, 70 (2000) ("[C]ollateral estoppel will bar relitigation of the issues actually decided during the arbitration proceeding.").

> One who was not a party to a prior arbitration may use the arbitration award to bind an adverse party in a subsequent proceeding if, among other things, the adverse party or its privy was a party to the arbitration and "enjoyed a full and fair opportunity to litigate th[e] issue in the earlier proceeding."

Whitlock, 205 N.C. App. at 448, 696 S.E.2d at 546 (alteration in original) (quoting Whiteacre P'ship v. Biosignia, Inc., 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004)).

This court may take judicial notice of the NFLPA arbitration opinion and award.  This court does so "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity."  See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999); see also Andrews v. Daw, 201 F.3d 521, 524 n.1 (4th Cir. 2000); Sun Chem. Trading Corp. v. CBP Res., Inc., No. 1:01CV00425, 2004 WL

-12-

1777582, at *3 (M.D.N.C. July 29, 2004).  Plaintiffs have not disputed the authenticity of the arbitration opinion and award submitted by Defendants.

Plaintiff Carey and Quinn agreed to a stipulation of the issues to be resolved by the arbitrator.  (See Defs.' Mem., Ex. 1 (Doc. 32-1) at 3.)  The arbitrator held a hearing during which both parties "had the opportunity to examine and cross-examine witnesses as well as present evidence in support of their respective positions."  (Id.)  After that hearing, the arbitrator produced a written opinion and award.  As potentially relevant to the present lawsuit, the arbitrator found that Plaintiff Carey was entitled to $17,500 in quantum meruit for the reasonable value of the services he performed as a contract advisor.  (Id. at 35.)  In reaching the decision, the arbitrator considered the broad range of services that are cited in the Amended Complaint.  The arbitrator also found that Quinn properly terminated his SRA with Plaintiff Carey.  (Id.)

Based on the foregoing, this court finds that the reasonable value of Plaintiff Carey's services and whether Quinn properly terminated the SRA were raised and actually litigated during the arbitration proceeding.  Because the arbitrator's findings regarding these stipulated issues were incorporated in the arbitral award, they were material and relevant, as well as

-13-

necessary and essential, to the disposition of the NFLPA arbitration and resulting judgment. Furthermore, Plaintiff Carey had a full and fair opportunity to litigate those issues during the arbitration. Also, to the extent Plaintiff Champion was not a party in the arbitral proceeding, Plaintiff Carey served as its privy.

Accordingly, Plaintiffs are collaterally estopped from relitigating the reasonable value of their services and the issue of whether Quinn properly terminated the SRA. The extent to which these same issues are presented in this case will be addressed where relevant.

**(2) Substantive Claims**

This court now considers whether Plaintiffs have adequately stated any of their claims. For the reasons that follow, Defendants' motion to dismiss will be granted as to the slander per se, tortious interference, and unjust enrichment claims. The motion will be denied as to the unfair methods of competition and civil conspiracy claims.

**(i) Slander Per Se**

Defendants move to dismiss the slander per se claim, arguing that Plaintiffs have failed to allege an actionable defamatory statement. To state a claim for slander per se, a plaintiff must allege that: "(1) th[e] defendant's statement was

-14-

slanderous per se, (2) the statement was false, and (3) the statement was published or communicated to and understood by a third person." Shillington v. K-Mart Corp., 102 N.C. App. 187, 194, 402 S.E.2d 155, 159 (1991) (citing West v. King's Dep't Store, Inc., 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1988)). A statement impeaching one's trade or profession is actionable per se, but such statements "(1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business." Badame v. Lampke, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955); see also Gibson v. Mut. Life Ins. Co. of N.Y., 121 N.C. App. 284, 289, 465 S.E.2d 56, 59-60 (1996). If a plaintiff states a claim for slander per se, "a prima facie presumption of malice and a conclusive presumption of damage arises, obviating the need for the plaintiff to plead and prove special damages." Eli Research, Inc. v. United Commc'ns Grp., LLC, 312 F. Supp. 2d 748, 761 (M.D.N.C. 2004) (citing Barker v. Kimberly-Clark Corp., 136 N.C. App. 455, 460, 524 S.E.2d 821, 825 (2000)).

Here, the slander per se claim will be dismissed because Plaintiffs have not alleged an actionable defamatory statement. There are "'constitutional limits on the type of speech' subject to a defamation action." Daniels v. Metro Magazine Holding Co., 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006) (quoting

-15-

Milkovich v. Lorain Journal Co., 497 U.S. 1, 16 (1990)). For example, "expressions of opinion not asserting provable facts are protected speech." Id. (citing Milkovich, 497 U.S. at 20). "Although someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability, a pure expression of opinion is protected because it fails to assert actual fact." Id.

Plaintiffs rely on three allegedly defamatory statements: (1) that Plaintiff Carey "should have been getting endorsement deals for Quinn"; (2) that Defendants Impact, Fleming, and Frankel "could market Quinn better than Carey"; and (3) that Plaintiff Carey was "at fault for Quinn not being selected higher in the 2011 NFL Draft." (First Am. Compl. (Doc. 17) ¶ 85.) Although these statements touch Plaintiff Carey in his special trade or occupation as a player representative, they are not actionable because the statements are personal opinions that are "incapable of being actually or factually proven or disproven." Cf. Craven v. Cope, 188 N.C. App. 814, 818, 656 S.E.2d 729, 733 (2008) ("Whether plaintiff would 'raise . . . taxes' to pay for new development or whether plaintiff is 'against making development pay for itself' are defendant's political opinion and campaign assertions, which are incapable

of being actually or factually proven or disproven." (omission in original)).[3]

Because Plaintiffs have failed to allege an actionable defamatory statement, their slander per se claim will be dismissed.

### (ii) Tortious Interference

Defendants have also moved to dismiss Plaintiffs' claim alleging that they tortiously interfered with the SRA between Quinn and Plaintiff Carey. Under North Carolina law, the elements of tortious interference with contract are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

---

[3] Plaintiffs contend that this issue is an affirmative defense that should not be considered at the motion to dismiss stage. (Pls.' Resp. (Doc. 34) at 11-12.) Under North Carolina law, however, a court may properly consider whether the alleged statements support a claim of defamation on a motion to dismiss. See, e.g., Craven, 188 N.C. App. at 819-20, 656 S.E.2d at 734 (affirming a trial court's dismissal of a defamation claim on this basis); Daniels, 179 N.C. App. at 542, 634 S.E.2d at 592 (same).

Here, Plaintiffs have failed to state a tortious interference claim. The SRA between Plaintiff Carey and Quinn was a valid contract which, although terminable at-will, conferred certain rights on Plaintiff Carey.[4] Plaintiffs have also alleged that each Defendant knew of the agreement, that Defendants acted in concert to induce Quinn to terminate the SRA, and that Plaintiffs were damaged thereby. The only issue that warrants discussion is whether Plaintiffs have adequately alleged the fourth element, that is, that Defendants acted without justification.

A person "acts without justification in inducing the breach of contract . . . if he has no sufficient lawful reason for his conduct." Childress v. Abeles, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954). "Under North Carolina law, whether a defendant's conduct is justified depends upon the circumstances

---

[4] Defendants contend that the tortious interference claim should be dismissed because the SRA was terminable by either party to that agreement. Under North Carolina law, however, it is possible to tortiously interfere with a terminable contract. See Smith v. Ford Motor Co., 289 N.C. 71, 85, 221 S.E.2d 282, 291 (1976) ("The wrong for which the courts may give redress includes also the procurement of the termination of a contract which otherwise would have continued in effect."); see also Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988) ("The mere fact that the plaintiff's employment contracts with the employees in question were terminable at will does not provide the defendant a defense to the plaintiff's claim for tortious interference.").

surrounding the interference, the defendant's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the defendant, and the contractual interests of the other party." Ga. Pac. Consumer Prods., LP v. Von Drehle Corp., 618 F.3d 441, 456 (4th Cir. 2010) (citing Embree Constr. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992)). "Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." Embree Constr. Grp., 330 N.C. at 498, 411 S.E.2d at 924; see also Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988). "A defendant may encourage the termination of a contract if he does so for a reason reasonably related to a legitimate business interest." Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc., 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003) (internal quotation marks omitted).

"If an outsider to the contract has sufficient lawful reason for inducing the breach of contract, he is exempt from any liability, no matter how malicious in actuality his conduct may be." Robinson, Bradshaw & Hinson, P.A. v. Smith, 129 N.C. App. 305, 318, 498 S.E.2d 841, 851 (1998); see also Ga. Pac. Consumer Prods., 618 F.3d at 456 ("A malicious motive makes a

-19-

bad act worse, but it cannot make that wrong which, in its own essence, is lawful." (quoting *Childress*, 240 N.C. at 675, 84 S.E.2d at 182)). "In order to demonstrate the element of acting without justification, the action must indicate 'no motive for interference other than malice.'" *Area Landscaping, L.L.C.*, 160 N.C. App. at 523, 586 S.E.2d at 510 (quoting *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001)).

This court finds the analysis in *Peoples* controlling. In *Peoples*, the North Carolina Supreme Court stated:

> A motion under Rule 12(b)(6) should be granted when the complaint reveals that the interference was justified or privileged. In *Smith* we held that "[t]he privilege [to interfere] is conditional or qualified; that is, it is lost if exercised for a wrong purpose. In general, a wrong prupose exists where the act is done other than as a reasonable and bona fide attempt to protect the interest of the defendant which is involved." In determining whether an actor's conduct is justified, consideration is given to the following: the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor and the contractual interests of the other party. If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified. If, however, the defendant is acting for a legitimate business purpose, his actions are privileged. Numerous authorities have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful.

*Peoples*, 322 N.C. at 220-22, 367 S.E.2d at 650.

-20-

According to the Amended Complaint, Defendants were acting under a plan or scheme to induce Quinn to terminate his SRA with Plaintiff Carey only after he had extracted as much financial assistance and as many services as possible before negotiating a professional contract. Specifically, Quinn told Plaintiff Carey that Defendants had offered to pay Quinn $50,000 in addition to any money Quinn owed Plaintiff Carey if he terminated the SRA and signed with Defendants. Quinn also admitted in part to Defendants' alleged plan and to having already hired Defendants, which would have been before the five-day notice period expired.[5] Defendants Frankel and Fleming targeted Plaintiff Carey because he had expressed his concerns to student-athletes that Defendants Frankel and Fleming engaged in unethical business practices, and, as a result, Plaintiff Carey recommended that student-athletes not sign with them. By inducing Quinn to terminate his SRA with Plaintiff Carey, Defendants prevented

---

[5] This court is not persuaded that the arbitrator's finding that Quinn properly terminated his SRA with Plaintiff Carey collaterally estops Plaintiffs from arguing that Quinn had agreed to be represented by Defendants before the five-day notice period expired. The arbitrator appears to have only considered (1) whether the fax Quinn sent Plaintiff Carey was sufficient to terminate the relationship and (2) when Quinn officially entered an SRA with Defendant Fleming. (See Defs.' Mem. (Doc. 32-1) at 18.)

Plaintiff Carey from receiving a sizable commission on Quinn's professional contract.

However, the Amended Complaint also alleges that the NFLPA decertified as a union and therefore was no longer a governing body over player representatives. (First Am. Compl. (Doc. 17) ¶ 50.) As a result, numerous agents began to contact and communicate with players already under contract. (Id. ¶ 52.) The Amended Complaint also alleges the following:

> 5. Defendant Mitchell Frankel . . . was an active officer and registered agent for Impact with direct and supervisory authority over Tony Fleming and is registered as a player-agent representative for Impact.

> 6. Defendant Tony Fleming . . . was employed as a player-agent representative for Impact.

> 72. While still under contract with Plaintiffs, Quinn agreed to be represented by Defendants. Under this plan and scheme, Quinn was to remain with Carey to take as much from Plaintiffs until contacted by the Rams and then leave Plaintiffs when contact [sic] discussions began with the Rams.

> 78. On or about July 22, 2011, Quinn agreed to be represented by Impact, Frankel, and Fleming.

> 84. Upon information and belief, Austin recruited football players, on behalf of Impact, Frankel, and Fleming for the purpose of the football players becoming clients of Impact, Frankel, and Fleming. Austin received monetary compensation for his services of recruiting potential clients on behalf of Impact, Frankel, and Fleming and persuading them to leave their existing relationship.

86.  As a result of Impact's, Frankel's, Fleming's, and Austin's improper communication, Quinn was induced to wrongly terminate Carey as his player-agent representative and hire Impact, Frankel, and Fleming for representation.

This court finds that the complaint reveals on its face that the alleged interference was justified or privileged.

If . . . the defendant is acting for a legitimate business purpose, his actions are privileged. Numerous authorities have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful.

Peoples, 322 N.C. at 221, 367 S.E.2d at 651.

Even assuming that Impact, Frankel, Fleming, Austin, and White all had a malicious motive for inducing Quinn to terminate his contract, that motive is insufficient to permit this case to proceed in light of the business justification. "If an outsider to the contract has sufficient lawful reason for inducing the breach of contract, he is exempt from any liability, no matter how malicious in actuality his conduct may be."  Robinson, Bradshaw, 129 N.C. App. at 318, 498 S.E.2d at 851; see also Ga. Pac. Consumer Prods., 618 F.3d at 456 ("A malicious motive makes a bad act worse, but it cannot make that wrong which, in its own essence, is lawful." (quoting Childress, 240 N.C. at 675, 84 S.E.2d at 182)); Area Landscaping, 160 N.C. App. at 523, 586 S.E.2d at 510  ("In order to demonstrate the element of acting

-23-

without justification, the action must indicate '*no motive for interference other than malice*.'" (quoting <u>Filmar Racing</u>, 141 N.C. App. at 674, 541 S.E.2d at 738) (emphasis added)).

This court therefore finds that Defendants' motion to dismiss should be granted as to Plaintiffs' tortious interference claim because the complaint alleges on its face that Defendants had a legitimate business motive for inducing Quinn into terminating his contract with Plaintiffs.

### (iii) Unfair Methods of Competition

Defendants also move to dismiss Plaintiffs' claim under N.C. Gen Stat. § 75-1.1. That statute makes "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," illegal. N.C. Gen Stat. § 75-1.1. "Commerce" is defined as including "all business activities, however denominated." <u>Id.</u> To state a claim for unfair trade practices under North Carolina law, a plaintiff must allege three elements: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant." <u>Boyce & Isley, PLLC v. Cooper</u>, 153 N.C. App. 25, 35, 568 S.E.2d 893, 901 (2002).

"A practice . . . is deceptive if it has a tendency to deceive." <u>Dalton v. Camp</u>, 353 N.C. 647, 656, 548 S.E.2d 704,

-24-

711 (2001). "A practice is unfair when it . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007) (quoting Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 203 (1981)). "[O]nly practices that involve '[s]ome type of egregious or aggravating circumstances' are sufficient to violate the UTPA." S. Atl. Ltd. P'Ship of Tenn., L.P. v. Riese, 284 F.3d 518, 535 (4th Cir. 2002) (second alteration in original) (quoting Dalton, 353 N.C. at 657, 548 S.E.2d at 711); Dalton, 353 N.C. at 656-57, 548 S.E.2d at 711 (2001) ("Moreover, '[s]ome type of egregious or aggravating circumstances must be alleged and proved before the [Act's] provisions may [take effect].'" (alterations in original)(quoting Allied Distribs., Inc. v. Latrobe Brewing Co., 847 F. Supp. 376, 379 (E.D.N.C. 1993))). "In determining the unfair or deceptive nature of an act or practice, each case is fact specific . . . ." Carcano v. JBSS, LLC, 200 N.C. App. 162, 172, 684 S.E.2d 41, 50 (2009).

In light of both the broad definition of "unfair" practices and the allegations contained in the Amended Complaint, this court finds Defendants' motion should be denied. These allegations, inter alia, include that Defendants maliciously planned to extract as much money and services from Plaintiffs

-25-

before terminating his SRA with Plaintiffs when NFL contract negotiations began.  Plaintiffs allege that Defendants offered to pay Quinn over $50,000 if he terminated the SRA and signed with Defendants and, further, that Defendants Frankel and Fleming specifically targeted Plaintiff Carey in retaliation for Plaintiff Carey advising student-athletes to avoid entering contracts with Defendants Frankel and Fleming.  This court finds that Plaintiffs have alleged at least a plausible claim for unfair or deceptive trade practices.  Cf. Walker v. Sloan, 137 N.C. App. 387, 395-96, 529 S.E.2d 236, 243 (2000) (finding a claim for unfair or deceptive trade practices properly pled where the complaint alleged the defendant attempted to break up and bribe a competitor's employee group).

### (iv) Civil Conspiracy

Defendants also move to dismiss the civil conspiracy claim. To state a civil conspiracy claim under North Carolina law, a plaintiff must allege "a conspiracy, wrongful acts done by certain of the alleged conspirators, and injury."  Henry v. Deen, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984).  Because the unfair methods of competition claim survives and the Amended Complaint alleges that Defendants had an agreement to commit the acts underlying those claims, the Amended Complaint adequately

states a claim for civil conspiracy.  Accordingly, the motion to dismiss that claim will be denied.

### (v) Unjust Enrichment

Defendants Impact, Frankel, and Fleming move to dismiss the claim for unjust enrichment under the clean hands and collateral estoppel doctrines.  For the reasons that follow, this court finds that Plaintiffs are collaterally estopped from raising their claim based on unjust enrichment.  Therefore, that claim will be dismissed.

To state a claim for unjust enrichment, a plaintiff must allege that he

> conferred a benefit on the other party.  The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances.  The benefit must not be gratuitous and it must be measurable.

Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

Plaintiffs base their claim for unjust enrichment on the services Plaintiff Carey provided to Quinn in preparing him for the NFL Draft and contract negotiations.  (See First Am. Compl. (Doc. 17) ¶ 131 (alleging that Defendants Impact, Frankel, and Fleming "have been unjustly enriched in that they benefitted by not having to complete the necessary work for Quinn to agree to a contract with the St. Louis Rams and having all such work and

-27-

effort completed by Plaintiffs"); Pls.' Resp. (Doc. 34) at 9 ("Plaintiffs alleged that they conferred a benefit upon Defendants in the form of exerting a tremendous amount of effort, energy, and money on helping Quinn's pre-draft status, specifically taking steps to get Quinn back in football-shape, helping Quinn deal with his public persona, and coaching him on issues that would come up such as his brain tumor and past indiscretions.").) For purposes of this motion, this court assumes that the Amended Complaint properly states an unjust enrichment claim.

However, this court finds that Plaintiffs are collaterally estopped from raising their unjust enrichment claim. As discussed above, Plaintiff Carey has already recovered in quantum meruit for the reasonable value of his services through the NFLPA arbitration process. "Quantum meruit 'operates as an equitable remedy based upon a quasi contract or a contract implied in law' which provides 'a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment.'" Ron Medlin Constr. v. Harris, 364 N.C. 577, 580, 704 S.E.2d 486, 489 (2010) (quoting Paul L. Whitfield, P.A. v. Gilchrist, 348 N.C. 39, 42, 497 S.E.2d 412, 414-15 (1998)). Thus, Plaintiffs have already been compensated for the services upon which their unjust enrichment claim is based. "A

-28-

'disappointing' result does not entitle a litigant to seek damages for the same injuries from another defendant in the hopes of a better recovery."  Sun Chem. Trading Corp. v. CBP Res., Inc., No. 1:01CV00425, 2004 WL 1777582, at *5 (M.D.N.C. July 29, 2004).

Defendants Impact, Frankel, and Fleming also contend that the unjust enrichment claim is barred by the unclean hands doctrine because Plaintiff Carey violated the NFLPA's Junior Rule by contacting Quinn before December of his junior year. See Creech v. Melnik, 347 N.C. 520, 529, 495 S.E.2d 907, 913 (1998) ("One who seeks equity must do equity.").  Plaintiffs contend that, because Quinn had been declared permanently ineligible by the NCAA, it is an open question whether the Junior Rule continued to apply.

On the record as it stands at this stage of the proceedings, there is no basis upon which to find that Plaintiffs violated the Junior Rule in recruiting Quinn or that unclean hands should apply.  Thus, this court finds that a dismissal based on unclean hands at this stage of the proceedings is not proper.  However, Plaintiffs' unjust enrichment claim will still be dismissed based on the finding of collateral estoppel.

-29-

## IV.  CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss the Amended Complaint (Doc. 31) is **GRANTED IN PART AND DENIED IN PART.**  The motion is **GRANTED** as to Plaintiffs' slander per se, tortious interference with contract, and unjust enrichment claims.  The motion is **DENIED** as to Plaintiffs' unfair methods of competition and civil conspiracy claims.

This the 30th day of September, 2013.

_____
United States District Judge