IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHAMPION PRO CONSULTING           )
GROUP, LLC, and CARL E.           )
CAREY, JR. Ph.D.,                 )
                                  )
            Plaintiffs,           )
                                  )
    v.                            )        1:12CV27
                                  )
IMPACT SPORTS FOOTBALL,           )
LLC, MITCHELL FRANKEL, TONY       )
FLEMING, and MARVIN AUSTIN,       )
                                  )
            Defendants.           )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Plaintiffs Champion Pro Consulting Group, LLC ("Champion Pro") and Carl E. Carey, Jr., Ph.D. ("Carey") (collectively "Plaintiffs") initiated these proceedings against Defendants Impact Sports Football, LLC ("Impact Sports"), Mitchell Frankel ("Frankel"), Tony Fleming ("Fleming"), and Marvin Austin ("Austin") (collectively "Defendants"), alleging a series of actions that violate Section 75-1.1 of the North Carolina General Statutes and that constitute a civil conspiracy.[1]

Presently before this court is Defendants' Motion for Summary Judgment. (Doc. 62.) Plaintiffs have filed a memorandum

_____

[1] Plaintiffs made additional claims but those claims were dismissed in this court's Memorandum Opinion and Order issued on September 30, 2013. (Doc. 41.)

in support of their motion and a statement of material facts. (Docs. 63, 66.)  After Defendants filed their motion, the parties continued to conduct discovery.

At the close of discovery, Plaintiffs filed a Response in Opposition to Defendants' Motion for Summary Judgment along with a wide array of exhibits and extensive statements of material facts.  (Docs. 127, 128, 129, 130, 131, 132.)  Defendants then filed a reply, accompanied by a response to Plaintiffs' statements of material facts.  (Docs. 137, 138.)  This court ruled on several preliminary matters (Doc. 143), and on March 30, 2015, a hearing was held on Defendants' Motion for Summary Judgment.  (Minute Entry 3/30/2015.)

Defendants' motion is now ripe, and for the reasons stated herein, this court will grant Defendants' Motion for Summary Judgment.

## I.  **FACTS**

The parties have submitted extensive lists of facts and characterized those facts as material and either undisputed or controverted.  (Docs. 66, 130, 131, 138.)  The parties have incorporated these documents by reference in their briefing on the summary judgment motion.  This practice is neither allowed by the Local Rules of the Middle District of North Carolina, nor is it condoned by this court.  See LR 7.3(d) (limiting briefs in

support of motions and responsive brief to 20 pages).
Nonetheless, this court has reviewed these documents, and in
keeping with its obligations under Fed. R. Civ. P. 56, this
court provides the following recitation of material facts that
are supported by record evidence.

The current controversy involves a dispute between Robert
Quinn's current and former agents. While Robert Quinn ("Quinn")
and Christina White (then Robert Quinn's girlfriend and now
Quinn's wife ("C. Quinn")), were originally named as defendants,
Plaintiffs have dismissed all claims against both individuals,
first without prejudice, (Stipulation for Dismissal of Def.
Robert Quinn (Doc. 12)), and then with prejudice, (Stipulation
of Dismissal with Prejudice (Doc. 39)).  Quinn played college
football at the University of North Carolina at Chapel Hill
("UNC") from 2008 until he was deemed permanently ineligible in
2010.  In 2011, he was chosen as the 14th overall pick in the
National Football League ("NFL") Draft by the St. Louis Rams.
After the NFL and the NFL Players Association ("NFLPA") agreed
to a new Collective Bargaining Agreement ("CBA") in July 2011,
Quinn signed a contract on August 4, 2011, for $4,073,468 over
his first four seasons with the Rams and with a signing bonus of
$5,362,585.  (Pls.' Ex. 43, NFL Player Contract between Quinn
and The St. Louis Rams, LLC (Doc. 128-11) at 1, 5.)  This

-3-

lawsuit involves a dispute between Quinn's former "Contract Advisor" or agent - Plaintiff Carey and his firm, Champion Pro - and Quinn's present agent – Defendant Fleming and his firm, Impact Sports.

Plaintiff Carey is a certified registered advisor with the NFLPA and an associate professor at Lonestar College in Kingwood, Texas.  While Quinn was a student at UNC, Carey cultivated a relationship with Quinn, and on December 4, 2010, Quinn signed a Standard Representation Agreement ("SRA") with Carey.  (Pls.' Ex. 1, SRA between Carey and Quinn (Doc. 127-1).) As Quinn's agent, Carey performed a variety of services to assist Quinn with his transition to the NFL and to help Quinn prepare for the NFL Combine, his Pro Day, and the NFL Draft. (Pls.' Statement of Additional & Controverted Material Facts ("Pls.' Statement Add'l Facts") (Doc. 131) ¶¶ 158-66.)

In late July 2011, Quinn terminated his relationship with Plaintiffs and signed a new SRA with Defendant Fleming and his firm, Impact Sports.  Defendants had wanted to represent Quinn since at least May of 2010. (See Pls.' Ex. 25, Recruiting List 2010 (Doc. 129-13) at 2.)  Defendants admit that they met with Quinn in Miami in mid-June 2011, while Quinn was represented by Plaintiffs. (Defs.' Statement of Material Facts (Doc. 66) ¶ 8; see also Pls.' Ex. 6, Tony Fleming Deposition Excerpts Vol. I

-4-

("Fleming Dep. Vol. I") (Doc. 127-7) at 38 (stating that Quinn "started coming around" as Austin signed an SRA with Impact Sports, which occurred on June 15, 2011).)[2]  Defendants also admit that they met with Quinn again between that meeting and mid-July. (Pls.' Ex. 18, July 4, 2011 Email (Doc. 129-4); Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 40.)  Later, on July 20, 2011, Quinn notified Carey by text message that he was terminating his SRA with Plaintiffs.  As a text message is not a sufficient means of terminating an SRA under the NFL-NFLPA CBA, Quinn formally terminated his SRA with Plaintiffs via fax on July 22, 2011.  (Pls.' Ex. 22, Fax from Quinn to Carey (Doc. 129-10).)

Quinn then signed an SRA with Defendant Fleming, dated July 28, 2011.  (Pls.' Exs. 4-5, SRA between Fleming & Quinn (Docs. 127-5, 127-6).)  Along with executing an SRA, Quinn and Defendants also entered into a "Marketing Advance Agreement," pursuant to which Impact Sports was to advance Quinn $100,000 by July 31, 2011, to be recouped out of Quinn's "Marketing Income." (Pls.' Ex. 15, Marketing Advance Agreement (Doc. 127-16) ¶¶ 2-3; Pls.' Ex. 41, Impact Sports Check 1058 (Doc. 128-9) (directing

---

[2] All citations to page numbers refer to the page number in the bottom right-hand corner stamped during the electronic filing process and as they appear on CM/ECF.

payment of $50,000 to Quinn on July 29, 2011); Pls.' Ex. 42, Impact Sports Check 1059 (Doc. 128-10) (same).)

It is important to note that these events take place in the context of the "lock-out" that resulted from a breakdown in CBA negotiations between the NFL and the NFLPA.  In their Amended Complaint, Plaintiffs explain that from March 11 to July 25, 2011, the NFLPA decertified as a union representing NFL players and, among other things, regulating their Contract Advisors. (Am. Compl. (Doc. 17) ¶¶ 51-53.)  As part of this process, the NFLPA discontinued its agent regulation system, making it possible for agents to contact and communicate with players under existing contracts with other agents, something that is normally prohibited by the NFLPA.  (Id.)

While the parties are generally in agreement as to the foregoing timeline, the parties dispute a number of facts that Plaintiffs use to infer that Defendants recruited Quinn and induced Quinn to terminate his SRA with Plaintiffs.  As a general matter, Plaintiffs rely extensively on the deposition of Sean Kiernan to show that genuine disputes exist as to their allegations.  Kiernan began working for Impact Sports in May 2003 and resigned on July 8, 2014.  (Pls.' Ex. 7, Sean Kiernan Oral Deposition ("Kiernan Dep.") (Doc. 127-8) at 3-4.) Defendants describe Kiernan as "a disgruntled former employee."

(Defs.' Resp. to Pls.' Statement of Add'l Facts (Doc. 138) at 4.)

As a means of giving context to the following disputed facts, this court notes that Plaintiffs make three general allegations to support their claims that Defendants committed unfair and deceptive acts or practices and engaged in a civil conspiracy: (1) Defendants illegally used "runners" to recruit Quinn as a client; (2) Defendants paid a large amount of money to Quinn in the form of a "Marketing Advance" as a means of inducing him to terminate his SRA with Plaintiffs; and (3) Defendants committed these acts as a means of retaliating against Plaintiffs. (See Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Mem.") (Doc. 132) at 2.) In this section, this court outlines the factual disputes concerning these three claims.

First, Plaintiffs claim that individuals associated with and working on behalf of Impact Sports began recruiting Quinn well before July 2011. Plaintiffs identify Todd Stewart as being one of the individuals who actively recruited Quinn on behalf of Defendants. Stewart and Defendant Frankel met each other in 1997 and were reintroduced in 2010 by Defendants Fleming and Austin. (Pls.' Ex. 11, Mitch Frankel Deposition ("Frankel Dep.") (Doc. 127-12) at 24.) Defendants admit that

Stewart worked with Impact Sports on a trial basis from roughly 2009 until the NFL lock-out in 2011, mainly by introducing the firm's agents to athletes whom Stewart knew, and that Stewart acted as an intermediary between Quinn and Impact Sports beginning in June 2011. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Doc. 63) at 8; Pls.' Ex. 10, Anthony Fleming Deposition Excerpts Vol. III ("Fleming Dep. Vol. III") (Doc. 127-11) at 41-43.) Stewart says he does not remember receiving money from Impact Sports (see Pls.' Ex. 19, Todd Stewart Deposition ("Stewart Dep.") (Doc. 129-5) at 15, 27), but Plaintiffs point to reports made by Kiernan that Stewart was actively working on behalf of Impact Sports to recruit Quinn well before June 2011. Kiernan says he asked whether Stewart was being paid one-third of what Impact Sports received from Quinn's contract, and Fleming confirmed this fact at some point in 2011 or 2012. (Pls.' Ex. 7, Kiernan Dep. (Doc. 127-8) at 48-49.) Kiernan also remembers seeing advances paid to Stewart through Western Union during 2011 and 2012, in amounts as high as $5,000 per month. (Id. at 49.) Fleming explains in his deposition that (1) Stewart was helping introduce players to the agents at Impact Sports but was not an employee; (2) Stewart was eventually given a referral fee when Quinn signed as a client with Impact Sports; (3) Fleming loaned money to Stewart three or

-8-

four times during the relevant period; and (4) Impact Sports reimbursed Stewart's expenses for coming to the June 2011 meeting in Miami with Quinn because Stewart "made the meeting happen." (See Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 23-24, 27-29.)

Plaintiffs further assert that Defendant Marvin Austin, Quinn's friend and former teammate, encouraged Quinn to sign with his agent, Impact Sports. (See Pls.' Ex. 12, Marvin Austin, Jr. Deposition ("Austin Dep.") (Doc. 127-13) at 15; Pls.' Ex. 20, July 12, 2011 Email (Doc. 129-6) ("[Fleming], Balmer, and Austin are making a hard push at Quinn today!").) Plaintiffs also point to the deposition of Constance Orr to show that Quinn was receiving large amounts of money while a student at UNC (Pls.' Ex. 24, Affidavit of Constance Orr ("Orr Aff.") (Doc. 129-12) ¶ 7), but Plaintiffs do not cite any admissible evidence that would suggest who was providing the money. (See Pls.' Statement of Add'l Facts (Doc. 131) ¶¶ 120-26 (citing hearsay statements of Quinn, who is not a party to this suit).)

Additionally, Plaintiffs cite a tremendous number of calls that occurred between Fleming, Austin, Stewart, and C. Quinn. (Id. ¶¶ 315-381.) Calls between Fleming and Stewart date back as far as June 21, 2010. (Id. ¶ 315.) Calls between Fleming, Stewart, and Austin date back as early as November 5, 2010.

-9-

(Id. ¶ 323.)  The first mention of C. Quinn being on the call log is June 6, 2011, shortly before the meeting between Quinn, C. Quinn, and Fleming in Miami.  (See id. ¶ 349.)  Although Plaintiffs point out that Fleming called a phone with the same area code as Robert Quinn's phone on June 27, 2010 (id. ¶ 318), the "first documented call between a number known to belong to Robert Quinn and a number known to belong to Impact Sports occur[ed] on July 21, 2011," the day after Quinn unofficially ended his relationship with Plaintiffs.  (Id. ¶ 373.) Plaintiffs note that none of the many text messages sent by any of the Defendants during this time period have been produced. (See id. ¶¶ 307-10.)[3]

Although Defendants do not dispute that they met with Quinn in Miami in mid-June 2011 (see, e.g., Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 29), there was some dispute at the hearing on this motion as to whether this meeting was a chance encounter, a meeting set up by Quinn in his effort to acquire new representation, or a meeting initiated by Defendants. Fleming credits Stewart for the meetings, saying that Stewart

---

[3] Plaintiffs filed a Motion for Sanctions in this case (Doc. 120), based on these lost or deleted text messages.  This court has granted that motion in part in an order entered contemporaneously with this Memorandum Opinion and Order.  As part of the sanction imposed, this court indicated that it will not permit Defendants to claim that they did not communicate with Quinn during the relevant period.

"made the meeting happen." (Id.) Fleming says that Stewart called Fleming and said that Quinn had questions and wanted to speak with Fleming. (Id. at 24.) Thus, this court will not conclude that it was a "chance encounter."

Second, along with the evidence of recruitment, Plaintiffs claim that the "Marketing Advance" given by Defendants to Quinn was in fact a paid inducement to terminate the SRA with Plaintiffs and sign with Defendants. Quinn and Fleming first discussed a marketing advance during meetings that occurred sometime "over a month's time" after the mid-June 2011 meeting in Miami – and thus, before Quinn terminated his SRA with Plaintiffs. (See Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 40.) In support of their allegation regarding the true nature of the Marketing Advance between Quinn and Defendants, Plaintiffs assert that an advance of this amount is irregular, as the St. Louis market is a historically difficult market for NFL rookies to acquire marketing opportunities. (See Pls.' Ex. 7, Kiernan Dep. (127-8) at 44-45; see also Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 40 (citing the market research done by Sean Kiernan).) Specifically, Kiernan estimates that before he left Impact Sports in 2014, Quinn had only generated approximately $10,000 in marketing revenue. (Pls.' Ex. 7, Kiernan Dep. (Doc. 127-8) at 45.) Additionally, Plaintiffs also

-11-

note that Quinn requested that the 20 percent marketing fee be removed from one of his later invoices from Defendants. (Pls.' Ex. 8, Dec. 18, 2011 Email from Fleming to Frankel (Doc. 127-9).) In response, Defendants submit evidence that Quinn was later charged and did pay the marketing fee. (Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Reply"), Ex. A, Mar. 28, 2012 Invoice (Doc. 137-1) at 2.) Nonetheless, Plaintiffs argue that this arrangement leads to the reasonable inference that Quinn was never meant to repay the Marketing Advance and that it was merely a means of inducing him to break his SRA with Plaintiffs.

Third, Plaintiffs allege that the improper actions taken by Defendants were not motivated by Defendants' business interests but by a desire to retaliate against Plaintiffs. Plaintiffs posit that Defendants remain bitter over Plaintiff Carey's advice to NFL player Julius Peppers to avoid Impact Sports as Peppers selected an agent before entering the NFL in 2002. (See Pls.' Ex. 21, Carl E. Carey Deposition Vol. II ("Carey Dep. Vol. II") (129-8) at 14.) Plaintiffs do not have direct evidence of this purported animosity but cite to Fleming referring to Peppers as the "one that got away" (Pls.' Ex. 10, Fleming Dep. Vol. III (Doc. 127-11) at 39); Frankel mentioning that there was "frustration" at not being able to represent Peppers (Pls.' Ex.

11, Frankel Dep. (Doc. 127-12) at 22); Kiernan's relaying that he heard Frankel tell people at 20 or 30 meetings that Frankel advised Peppers to go back to school for another year, which improved Pepper's draft position but that Impact Sports "lost him over the course of the next year" (Pls.' Ex. 7, Kiernan Dep. (Doc. 127-8) at 26); and Kiernan stating that people were upset around the Impact Sports office at losing the chance to represent Peppers. (Id.) Corroborating their theory of retaliatory animus, Plaintiffs point to an email sent by Fleming on July 4, 2011, asking Kiernan to put together a comparison of Peppers contract, negotiated by Plaintiff Carey, with "what he should have got." (Pls.' Ex. 18, July 4, 2011 Email from Fleming to Kiernan (Doc. 129-4).) Nonetheless, in the surrounding statements within their depositions, Fleming and Frankel deny that they felt any animosity toward Carey or even knew who he was or that he now represents Peppers, before the commencement of litigation.

As part of their allegations that Defendants were motivated by retaliation and not business interests, Plaintiffs point to the timing of Quinn's decision to terminate his SRA with Carey. Plaintiffs note that, at the June 2011 meeting in Miami, Defendants "possibly" provided Quinn a sample termination letter to be addressed to Plaintiffs. (See Pls.' Resp. to Defs.'

-13-

Statement of Undisputed Material Facts (Doc. 130) at 28 (citing Pls.' Ex. 7, Kiernan Dep. (Doc. 127-8) at 36).)  However, Plaintiffs point out that Quinn waited until July 22, 2011, to terminate the SRA, and in the meantime, Carey paid for a trip to St. Louis for Quinn's family to look for a home.  (Id.) Additionally, Plaintiffs note that Quinn terminated the SRA "mere minutes after Carey informed Quinn that the Rams were interested in initiating contract negotiations."  (Id.) Moreover, Plaintiffs assert that, with Defendants' failure to preserve text messages, Defendants are precluded from asserting that they never discussed extracting money and services from Carey before Quinn terminated his SRA.  (Id. at 27.)

    In response to Plaintiffs' statement of the facts, Defendants rely on the version of events put forward in Quinn's declaration, namely, that Quinn retained Carey as his Contract Advisor, in part, due to the advice of his parents and several payments made by Carey; that Quinn was dissatisfied by Carey's representation; that Quinn met with several possible agents in the summer of 2011, including Fleming; and that Quinn determined on his own that he would terminate his relationship with Plaintiffs and sign with Defendants.  (See Defs.' Mem., Ex. 1, Declaration of Robert Quinn (Doc. 63-1) ¶¶ 3-5, 8, 10-18, 25-28.)

## II.  **LEGAL STANDARD**

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issue of material fact exists, thus entitling the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of initially demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.

If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial.  However, this requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts," the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations and footnote omitted) (quoting Fed. R. Civ. P. 56(e)).  In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must determine whether there is a genuine dispute as to a material issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Nonetheless, the court must ensure that the facts it considers can be "presented in a form that would be admissible

in evidence" and that any affidavits or evidence used to support or oppose a motion are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." See Fed. R. Civ. P. 56(c)(2), (4).

The court must view the facts in the light most favorable to the nonmoving party, drawing inferences favorable to that party if such inferences are reasonable. Anderson, 77 U.S. at 255. However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine. Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## III. **ANALYSIS**

Plaintiffs claim that Defendants violated Section 75-1.1 of the North Carolina General Statutes - the North Carolina Unfair and Deceptive Act or Practice statute ("Section 75-1.1") - when they allegedly recruited and induced Quinn to terminate his SRA with Plaintiffs. Plaintiffs also allege that Defendants engaged in a civil conspiracy in their attempt to recruit and induce Quinn. As the civil conspiracy claim is largely dependent on the Section 75-1.1 claim, this court will first address whether

-16-

there is a genuine dispute over Plaintiffs' Section 75-1.1
claim.

###    A.    Unfair & Deceptive Act or Practice

Section 75-1.1 declares as "unlawful" all "[u]nfair methods
of competition in or affecting commerce" or "unfair or deceptive
acts or practices in or affecting commerce."  N.C. Gen. Stat.
§ 75-1.1(a).  To show that an act or practice violates Section
75-1.1, a plaintiff must show that it "offends established
public policy"; is "immoral, unethical, oppressive,
unscrupulous, or substantially injurious to consumers"; or has a
tendency to deceive.  See Walker v. Fleetwood Homes of N.C.,
Inc., 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007).[4]

Under Section 75-1.1, "it is a question for the jury as to
whether the defendants committed the alleged acts, and then it
is a question of law for the court as to whether these proven

---

[4] The elements of a Section 75-1.1 claim are (1) an unfair
or deceptive act or practice; (2) the act or practice was in or
affecting commerce; and (3) the act or practice proximately
caused the injury to the plaintiff.  See Boyce & Isley, PLLC v.
Cooper, 153 N.C. App. 25, 35, 568 S.E.2d 893, 901 (2002).  As
Plaintiffs note, Defendants only challenge the first prong in
their summary judgment motion. (See Pls.' Mem. (Doc. 132) at 5.)
Because this court finds that there is no genuine dispute as to
the first prong, this court will not examine whether there is a
genuine dispute as to the second prong.  However, this court has
examined the third prong, whether any alleged unfair or
deceptive act proximately causes injury to Plaintiffs, on its
own accord and will discuss that prong as necessary throughout
this Memorandum Opinion and Order.

-17-

facts constitute an unfair or deceptive trade practice." United Labs., Inc. v. Kuykendall, 322 N.C. 643, 664, 370 S.E.2d 375, 389 (1988). Therefore, at the summary judgment stage, this court must determine whether there is a genuine dispute as to any of the material facts that a jury would be asked to find. However, this court must also examine the legal merits of Plaintiffs' claim to assess whether Defendants' actions would be found as a matter of law to not violate Section 75-1.1, even after assuming that the jury found all disputed facts in Plaintiffs' favor. See Eastover Ridge, L.L.C. v. Metric Constructors, Inc., 139 N.C. App. 360, 363, 533 S.E.2d 827, 830 (2000) (citing L.C. Williams Oil Co., Inc. v. Exxon Corp., 625 F. Supp. 477, 482 (M.D.N.C. 1985)).

At discussed in this court's recitation of material facts, there are three arguments on which Plaintiffs' base their Section 75-1.1 allegations, namely, the use of "runners," the Marketing Advance, and Defendants' retaliatory animus. This court will address each of these arguments to determine if there is a genuine dispute as to whether Defendants' actions, as alleged by Plaintiffs, constitute a Section 75-1.1 violation.

### i.   **Defendants' Use of "Runners"**

Plaintiffs first allege that Defendants violated Section 75-1.1 by using "runners," namely, Defendant Austin and non-

defendants Stewart and C. Quinn, to recruit Robert Quinn while he was represented by Plaintiffs. (Pls.' Mem. (Doc. 132) at 2.) Plaintiffs explain that this is an unfair or deceptive act, in part, because using runners in this way would violate the North Carolina law governing athlete agents and would violate the NFLPA's Rules Governing Contract Advisors. However, even assuming that Plaintiffs are correct in that these individuals worked for Defendants and tried to recruit Quinn on Defendants' behalf, this court does not find these actions unfair or deceptive.

Factually, this court finds that Plaintiffs have shown a genuine dispute as to whether Stewart, Austin, and C. Quinn played a role in encouraging Quinn to terminate his contract with Plaintiffs and sign with Defendants. As stated above, Stewart knew Defendants and began working with Defendants on a trial basis from 2009 through 2011. As part of his work for Impact Sports, Stewart would introduce Defendants to athletes. Although Stewart claims he does not remember receiving any money from Impact Sports, Sean Kiernan recalled that Fleming said Stewart was to be paid one-third of what Impact Sports received from Quinn's contract. Moreover, Kiernan testified that he saw Western Union money transfers made by Defendants to Stewart as advances on this amount. Fleming's statement, as testified to

-19-

by Kiernan, appears to be admissible as an admission by a party opponent, see Fed. R. Evid. 804(d)(2), and can be used to show that Stewart worked with Defendants as a "runner." Furthermore, Fleming's own deposition indicates that Stewart was a runner, in that Stewart was eventually compensated for bringing Quinn to Impact Sports, was reimbursed for his efforts to set up the June 2011 meeting, and spoke with Fleming about Quinn's thoughts on the meeting. (Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 27-29.) Fleming recalls a subsequent conversation with Stewart where Stewart used his demonstrated ability to "influence players or refer players or introduce us to players" to argue that Impact Sports should hire him as an employee, but that Impact Sports ultimately chose not to bring him in as an employee. (Id. at 30.) Additionally, Plaintiffs cite a number of calls that occurred between Stewart and Fleming, Austin, and C. Quinn. As a result of this evidence, this court finds that there is no dispute and this court will find that Stewart introduced Quinn to Defendants and was acting as an intermediary between Quinn and Defendants in 2011.

As for Austin and C. Quinn, this court finds that there is a genuine dispute that these individuals were encouraging Quinn to terminate his relationship with Plaintiffs and enter into an SRA with Fleming and Impact Sports. However, there is no

evidence that these individuals were working on behalf of Impact
Sports.  For instance, the first documented call between C.
Quinn - Robert Quinn's then girlfriend and now wife - and
Fleming was on June 6, 2011, days before their scheduled meeting
in Miami.  Therefore, this court will find that there is a
genuine dispute as to whether Austin and C. Quinn were
encouraging Quinn to leave Plaintiffs and sign with Defendants,
but this court has not been presented with evidence sufficient
for a reasonable juror to find that these individuals were
working on behalf of Defendants in trying to recruit Quinn.
(See Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 26
(indicating the role C. Quinn played during the June 2011
meeting).)

     Although this court has found that there is at least a
genuine dispute that Stewart, Austin, and C. Quinn were
encouraging Quinn to sign with Defendants, this court finds that
there is not sufficient evidence to support an inference that
these individuals were working at the direction of Defendants to
induce Quinn to terminate his relationship with Plaintiffs.  It
is admittedly a fine distinction between these individuals'
attempts to encourage Quinn to leave Plaintiffs and sign with
Defendants and the allegation that they sabotaged his
relationship with Plaintiffs.  Nonetheless, there is record

-21-

evidence that suggests that these individuals were motivated by other factors - whether Stewart's motivation to bring Quinn in as a client for Defendants, Austin's desire to have his friend sign with the same agency, or C. Quinn's desire to have her boyfriend and future husband work with a different agency - and Plaintiffs have not offered any evidence to suggest that these individuals were not motivated by other interests and were merely engaged in a plot directed by Defendants to "secretly recruit" and "solicit" Quinn and to "poison him against Carey," all on Defendants' behalf, as argued in Plaintiffs' brief, (see Pls.' Mem. (Doc. 132) at 12, 16.)

Going further, even if this court were to assume that Stewart, Austin, and C. Quinn were working to recruit Quinn on behalf of Impact Sports, this court does not find that these actions constitute a Section 75-1.1 violation. As a general matter, North Carolina courts have found that a violation of a statute or regulation can serve as the basis for a Section 75-1.1 violation, even when a statute or regulation does not specifically state that a violation of such statute is an unfair or deceptive practice. See Drouillard v. Keister Williams Newspaper Srvs., Inc., 108 N.C. App. 169, 172-73, 423 S.E.2d 324, 326 (1992) (finding that violating the North Carolina Trade Secrets Protection Act could serve as the basis for a Section

-22-

75-1.1 claim).  Here, Plaintiffs claim that Defendants have

violated Section 78C-86 of the North Carolina General Statutes,

the Uniform Athlete Agents Act ("UAAA"), by using "runners" who

have not registered with the North Carolina Secretary of State.

(Pls.' Mem. (Doc. 132) at 7.)  Based on this alleged violation

of the UAAA, Plaintiffs claim Defendants have engaged in conduct

constituting a Section 75-1.1 violation.  (See id.)

Plaintiffs' argument that Defendants violated the UAAA and

that this serves as the basis for a Section 75-1.1 violation is

flawed in two ways.  First, Plaintiffs claim that Defendants'

runners "began recruiting Quinn on behalf of [Defendant Impact

Sports] while Quinn was still in college at UNC in 2010" and

after Quinn was indefinitely suspended from UNC in late 2010.

(Pls.' Mem. (Doc. 132) at 7.)  Quinn signed his SRA with Carey

in December 2010, and these alleged acts of recruitment by

Defendants happened before Quinn signed with Plaintiffs.

Therefore, it is unclear what injury Plaintiffs may have

suffered from any recruitment of Quinn by Defendants while he

was a student, as Quinn eventually signed with Plaintiffs, not

Defendants.  As such, even if Stewart and the others were acting

as unregistered "athlete agents" in violation of the UAAA,

Plaintiffs have not shown that this violation proximately caused

injury to Plaintiffs, as required to show a violation of Section

75-1.1.  See Boyce & Isley, PLLC, 153 N.C. App. at 35, 568 S.E.2d at 901.

Second, Plaintiffs claim that Defendants violated the UAAA by using Stewart, C. Quinn, and Austin as runners after Quinn signed his SRA with Plaintiffs in December 2010.  (See Pls.' Mem. (Doc. 132) at 7-8.)  However, this recruitment is not covered by the UAAA, nor have Plaintiffs shown that the UAAA should be read to cover these actions.  The UAAA is only meant to protect "student-athlete[s]," which Quinn was not after he signed his SRA with Carey in December 2010.  Several definitions are relevant here: (1) the UAAA prohibits an individual from "act[ing] as an athlete agent in this State without holding a certificate of registration," N.C. Gen. Stat. § 78C-88(a); (2) an "athlete agent" is any individual "who enters into an agency contract with a student-athlete or, directly or indirectly, recruits or solicits a student-athlete to enter into an agency contract" or "who represents to the public that the individual is an athlete agent," id. § 78C-86(2) (emphasis added); and (3) a "student-athlete" is defined as an individual "who engages in, is eligible to engage in, or may be eligible in the future to engage in any intercollegiate sport." Id. § 78C-86(11).  Therefore, once Quinn became ineligible, either through his indefinite suspension from UNC or his signing of an SRA with

-24-

Carey, any recruitment by Impact Sports would not violate the UAAA. Because Quinn was ineligible to compete in intercollegiate athletics when he signed with Plaintiff Carey, it is impossible for Defendants' alleged recruitment through the use of runners to both violate the UAAA and interfere with Plaintiffs' contractual relationship with Quinn.

During the hearing on this motion, Plaintiffs also put forward that the use of runners violates the NFLPA Regulations Governing Contract Advisors ("NFLPA Regulation"). (See Pls.' Ex. 9, NFLPA Regulations (amended March 2007) (Doc. 127-10).) However, the NFLPA Regulations in effect at the time did not forbid the use of runners - that regulation would become effective as a new Section 3(B)(30) of the NFLPA Regulations on June 1, 2012. See Mem. to Contract Advisors Re: 2012 Amendments to the NFLPA Regulations Governing Contract Advisors (Apr. 10, 2012), available at http://www.scribd.com/doc/88972250/2012-Memo-to-Agents-Re-Amendments-to-the-Regulations. Therefore, the use of runners in 2010 and 2011 would not have violated NFLPA Regulations. Nonetheless, there was a relevant NFLPA Regulation that forbade direct or indirect communication with a represented player initiated by a Contract Advisor that pertains to (1) the player's current Contract Advisor, (2) the player's current SRA, (3) the player's contract status with any NFL Club, or

-25-

(4) services to be provided by the prospective Contract Advisor. (See Pls.' Ex. 9, NFLPA Regulations (amended March 2007) (Doc. 127-10) at 12, § 3(B)(21)(a).)  Conversation concerning any of these topics can be appropriate, however, if the represented player initiates the communication.  (Id. at 12, § 3(B)(21)(b).)

This court notes first that, had the NFLPA Regulations been in effect and had Defendants set up the June 2011 meeting in Miami, the conversations concerning the services that Defendants could provide would have violated Section 3(B)(21)(a)(iv) because it appears Quinn and Fleming discussed the services Fleming could provide Quinn.  There is no direct evidence that Defendants initiated the meeting, but Fleming's testimony does indicate that Stewart "made the meeting happen."  (See Pls.' Ex. 6, Fleming Dep. Vol. I (Doc. 127-7) at 29.)  Because there was an established working relationship between Impact Sports and Stewart, there is an argument that the facts could allow a reasonable jury to find Defendants violated Section 3(B)(21)(a)(iv) of NFLPA Regulations.

However, assuming that this is true, Plaintiffs have not demonstrated that, for the purposes of a Section 75-1.1 claim, a North Carolina court would find that the NFLPA Regulations, which were not in effect at the time, represent North Carolina public policy.  In denying a similar argument, the North

-26-

Carolina Court of Appeals held "that a violation of internal business policies and general industry standards does not constitute a per se violation" of Section 75-1.1.  In re Fifth Third Bank, Nat'l Ass'n-Vill. of Penland Litig., 217 N.C. App. 199, 209, 719 S.E.2d 171, 178 (2011), cert. denied, 366 N.C. 231, 731 S.E.2d 687 (2012). This court will apply this holding and find that Defendants' alleged violation of NFLPA Regulations by attending the meeting that Stewart set up with Quinn does not constitute a per se violation of Section 75-1.1.

Although Plaintiffs base their "runners" argument on an alleged UAAA violation and an alleged violation of NFLPA Regulations, this court has also examined whether using runners to recruit Quinn violates Section 75-1.1, even if it does not violate these regulations.  However, this court has not been given any reason to believe that the use of runners "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."

Finally, Plaintiffs use the fact that Defendants allegedly referred to Stewart as "Mr. Cowboy" on invoices and communications, as a means of showing that Defendants acted deceptively.  (Pls.' Mem. (Doc. 132) at 12.)  Assuming as true that Defendants used this code name for Stewart and that this

-27-

act was likely to deceive others about the true relationship between Stewart and Defendants, this court finds that this alone does not violate Section 75-1.1 because Plaintiffs have not shown that this act proximately caused injury to Plaintiffs.

Therefore, for these reasons, Plaintiffs have not shown that Defendants' alleged use of runners to recruit Quinn is a Section 75-1.1 violation.

### ii. **Defendants' Marketing Advance to Quinn**

Plaintiffs next argue that the Marketing Agreement signed between Impact Sports and Quinn, which included a $100,000 "Marketing Advance" to be paid immediately to Quinn, was actually a paid inducement for Quinn to terminate his SRA with Plaintiffs and sign with Defendants. Plaintiffs imply that the agreement was commercially unreasonable as St. Louis did not offer many marketing opportunities for Quinn. (Pls.' Mem. (Doc. 132) at 11.) Because it was commercially unreasonable, Plaintiffs argue that a jury could find that Defendants paid this money to induce Quinn to terminate his SRA, and if they did in fact offer such an inducement, Defendants have violated Section 75-1.1. (Id.) This court disagrees with this argument and finds as a matter of law that such acts in these circumstances are not a Section 75-1.1 violation.

Plaintiffs offer several pieces of evidence that they claim creates a genuine dispute as to the Marketing Advance being offered as an inducement.  Plaintiffs allege that Impact Sports never billed Quinn to reimburse this advance and that Quinn has had trouble generating marketing income since he signed his contract with the Rams.  (See Pls.' Mem. (Doc. 132) at 11-12.) However, Defendants have refuted this evidence with an invoice billing Quinn for marketing income.  (Defs.' Reply, Ex. A, Mar. 28, 2012 Invoice (Doc. 137-1) at 2.)

Plaintiffs also offer Kiernan's deposition to support the argument that St. Louis is a difficult market and, therefore, no one would offer such a large Marketing Advance.  Kiernan testified that the St. Louis market was "terrible" and "one of the worst markets in the league" for offering market opportunities to NFL rookies.  (See Pls.' Ex. 7, Kiernan Dep. (Doc. 127-8) at 39.)  One reason for the difficulty in securing marketing opportunities, Kiernan explains, is that game tickets have little value and thus players cannot trade their tickets with local businesses, something players often do in other markets. (Id. at 40.)  Furthermore, the NFL lock-out made it even more difficult for Contract Advisors to secure marketing opportunities for their rookie clients.  (Id. at 41.) Plaintiffs use these facts to argue "a reasonable juror could

-29-

infer Defendants never sought nor intended to receive marketing dividends from Quinn or have him pay back the marketing advance." (Pls.' Mem. (Doc. 132) at 12.)

With Kiernan's testimony on the difficulties of marketing a player in St. Louis, this court finds that Plaintiffs have demonstrated a genuine dispute as to whether Defendants had the intent, at least in part, to induce Quinn to terminate his contract with Plaintiffs and sign with Defendants when they offered the Marketing Advance. This court cannot weigh the credibility of potential witnesses during the summary judgment stage, Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979) (per curiam); nevertheless, without testing Kiernan's credibility, this court is allowed to evaluate whether the content of that testimony, if this court accepts the testimony as true, would support a Section 75-1.1 violation.

Besides evidence of the unreasonable nature of the Marketing Advance, Plaintiffs offer no other evidence that the Marketing Advance was an inducement. This is problematic because Kiernan himself specifically denied that the Marketing Advance was an inducement for Quinn to terminate his relationship with Plaintiffs and become a client of Impact

Sports.[5]  (Pls.' Ex. 7, Kiernan Dep. (Doc. 127-8) at 39.)  Nor do
Plaintiffs contest Kiernan's statement that the Marketing
Advance "was given in consideration of Quinn's potential long
term contract fees (i.e. the money Impact Sports would make off
of his NFL contracts as his agent)."  (Pls.' Mem. (Doc. 132) at
11.)  Thus, Plaintiffs' own evidence and arguments show that the
amount offered in the Marketing Advance was not merely a means
of inducing Quinn to terminate his SRA with Plaintiffs.  All of
these facts indicate that the Marketing Advance had at least a
mixed purpose; that is, Plaintiffs' own evidence shows that the
Marketing Advance had a business purpose for Defendants and was

---

[5] Specifically, Kiernan testified:

> A: [D]o I consider a marketing advance an
> inducement? No, I do not. That's just my personal
> opinion. And the NFLPA has ruled they're not an
> inducement.
>       . . . .
>
> A: I mean, obviously I don't know what made
> [Quinn] switch to us at the end of the day.  It wasn't
> my conversation that I had.  I'm just saying that the
> agreement says that he's agreeing it wasn't an
> inducement and that the [NFLPA] has ruled these are
> not - like these are valid documents as long as you've
> signed the SRA first.
>
> Q: And what is your opinion on that?
>
> A: I agree with that. I play within the rules
> that I'm presented.

(Pls.' Ex. 7, Kiernan Dep. (Doc. 127-8) at 39.)

not just an inducement or "bribe" for Quinn to terminate the contract with Plaintiffs, as Plaintiffs suggest. Therefore, this court finds that Plaintiffs have not created a genuine dispute as to their contention that "Defendants never sought nor intended to receive marketing dividends from Quinn or have him pay back the marketing advance." (See Pls.' Mem. (Doc. 132) at 12.)[6] Nonetheless, for the purposes of this motion, this court will assume that the jury would find that the Marketing Advance was at least in part an inducement for Quinn to terminate his SRA with Plaintiffs.

However, even assuming that the jury would find such a fact, this court, in accordance with North Carolina law, would not find that this action constitutes a Section 75-1.1

_____

[6] Plaintiffs make the argument that calling this payment a "Marketing Advance" is "deceptive and underhanded." (Pls.' Mem. (Doc. 132) at 11.) However, as explained herein, Plaintiff have not submitted evidence to show that the agreement was in no way a bona fide advance on marketing income, and Plaintiffs have presented no evidence that a Marketing Advance is commercially improper or otherwise an inappropriate contract. Therefore, this court does not find that the agreement has a "tendency to deceive." Moreover, the alleged deception is not between the parties to the contract, as it normally would be in a Section 75-1.1 claim; it is only as to what a third-party (Plaintiffs) perceives as to the intent of the parties entering the contract. Plaintiffs have not shown how this alleged deception of providing an inducement but calling it a Marketing Advance proximately caused injury to Plaintiffs. For these reasons, this alleged action does not fall within the purview of deceptive acts prohibited by Section 75-1.1. See Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989).

violation.  Plaintiffs cite a number of cases where competitors have been found liable under Section 75-1.1 because they have poached the employees or customers of a competitor.  See United Labs., Inc. v. Kuykendall, 335 N.C. 183, 437 S.E.2d 374 (1993); Harrington Mfg. Co. v. Powell Mfg. Co., 38 N.C. App. 393, 396, 248 S.E.2d 739, 741-42 (1978).  However, none of the cases cited by Plaintiffs address the specific question here - namely, whether or not it is a Section 75-1.1 violation to provide a monetary benefit to a competitor's client so that the client will terminate a terminable-at-will contractual relationship with that competitor.

This court finds that this case falls in between two established North Carolina precedents.  First, courts applying North Carolina law have found that a "simple breach of contract, even if intentional, does not amount to a [Section 75-1.1] violation."  Bartolomeo, 889 F.2d at 535.  To show a Section 75-1.1 violation, a plaintiff must show "substantial aggravating circumstances attending the breach."  Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992).  In particular, North Carolina courts have examined whether the contract was terminable at will, and if so, this factor has supported a finding that the termination of the contract was not a Section 75-1.1 violation.  See, e.g., Tar Heel Indus., Inc. v.

-33-

E.I. duPont de Nemours & Co., 91 N.C. App. 51, 57, 370 S.E.2d 449, 452 (1988); Dull v. Mut. of Omaha Ins. Co., 85 N.C. App. 310, 317, 354 S.E.2d 752, 756 (1987).  Moreover, the fact that a plaintiff has expended resources during a period when a defendant was planning to terminate the relationship was not sufficient to create a Section 75-1.1 violation based on the breaching of a contract.  See, e.g., Bartolomeo, 889 F.2d at 534-35; Tar Heel Indus., 91 N.C. App. at 56-57, 370 S.E.2d at 452.

Second, North Carolina courts have held that a competitor inducing an individual to breach a non-compete covenant with the individual's former employer can be a Section 75-1.1 violation. See Kuykendall, 335 N.C. at 184-85, 437 S.E.2d at 375-76; see also Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., 174 N.C. App. 49, 59-60, 620 S.E.2d 222, 230-31 (2005) (finding defendants' poaching of a large group of employees from a

-34-

competitor was found to be an unfair and deceptive act).[7]  In
Kuykendall, the plaintiff, United, employed Kuykendall to sell
chemical products, and Kuykendall was bound by an eighteen-month
non-compete agreement if he chose to terminate his employment
with United.  Id.  Later, Kuykendall terminated his employment
and immediately began to work for Share, a competitor of United.
In doing so, Kuykendall violated his non-compete agreement.  Id.
After the trial, the jury specifically found that Share:

> (a) Offer[ed] to pay legal fees and costs to induce
> Kuykendall, in breach of his covenant not to compete,
> to attempt to divert to Share, unfairly, United's
> accounts; (b) Induce[ed] Kuykendall to use his
> relationship with United's accounts and knowledge of
> confidential business information to attempt to
> divert to Share, unfairly, United's accounts; (c)
> Offer[ed] to subsidize the income, draw and expenses
> of Kuykendall in the event of an injunction, to
> induce Kuykendall, to divert to Share, unfairly,
> United's accounts; and (d) As a matter of routine
> practice, offer[ed] to pay legal fees and costs to
> induce experienced chemical sales representatives, in
> breach of the salesmen's covenant not to compete, to
> attempt to divert to Share, unfairly, the former
> employer's accounts.

---

[7] Even construing the evidence in a light most favorable to
Plaintiffs, the amount of deceptive conduct in this case does
not rival that found in Sunbelt Rentals, where defendants were
found to have told customers that plaintiff's company name had
changed to that of their new venture, to have used plaintiff's
lease contracts and pricing information for their own benefit,
to have inserted defendants' company name on plaintiff's
documents, and to have deleted plaintiff's job information and
forwarded plaintiff's phones to defendant upon leaving
plaintiff's employment.  See Sunbelt Rentals, 174 N.C. App. at
59-60, 620 S.E.2d at 230-31.

United Labs., Inc. v. Kuykendall, 102 N.C. App. 484, 491-92, 403 S.E.2d 104, 109 (1991), aff'd, 335 N.C. 183, 437 S.E.2d 374 (1993).  Based on these findings by the jury, the trial court found that Share had violated Section 75-1.1, and the court of appeals upheld this decision, as these facts "constituted unfair methods of competition and did not promote good faith dealing between Share and United."  Id.

Thus, the critical question here is whether there are substantial aggravating factors that move this from a typical breach of contract case[8] to one that constitutes a Section 75-1.1 violation. Generally, "[t]he type of conduct that has been found sufficient to constitute a substantial aggravating factor has generally involved forged documents, lies, and fraudulent inducements."  Stack v. Abbott Labs., Inc., 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013) (citing Garlock v. Henson, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115-16 (1993) (finding forgery of a bill of sale and three years of lies to deprive plaintiff of

_____

[8] Plaintiffs' evidence that the alleged activities constitute a breach of contract is speculative if not non-existent.  Plaintiffs' case is predicated upon the termination of a terminable-at-will agreement between a player (the principal) and the agent (an agent).  While there may have been some fiduciary or other relationship at issue, Plaintiffs have presented no evidence that this contract could not have been properly terminated at will as the contract specified, regardless of whether Defendants or anyone else sought to represent Quinn.

money owed under a contract sufficient to sustain a Section 75-1.1 claim);[9] Foley v. L & L Int'l, Inc., 88 N.C. App. 710, 714, 364 S.E.2d 733, 736 (1988) (upholding Section 75-1.1 claim where defendant retained plaintiff's down payment for seven months while falsely claiming it had ordered the car); Mapp v. Toyota World, Inc., 81 N.C. App. 421, 426, 344 S.E.2d 297, 301

---

[9] Plaintiffs argue that there is some discrepancy as to when Quinn signed the SRA with Impact Sports and that this deception shows that there has been a Section 75-1.1 violation. There are two different SRAs, one that gave Impact 3% of Quinn's contract value and one that gave Impact 1%. Both are dated July 28, 2011, and Plaintiff indicates that this discrepancy shows that Defendants were backdating contracts to cover up when Quinn signed the SRAs with Fleming. (See Pls.' Mem. (Doc. 132) at 12.) However, to the extent this is a lie or misrepresentation, this fact does not establish a Section 75-1.1 violation that injured Plaintiffs or help create a genuine issue as to Plaintiffs' other Section 75-1.1 allegations.

Additionally, there is no proof of record to show that Quinn or Defendants induced Plaintiffs to enter into the original SRA with Quinn. Therefore, the only issue in this case is whether the termination violated Section 75-1.1, unlike in Dealers Supply Co. v. Cheil Indus., Inc., 348 F. Supp. 2d 579, 595 (M.D.N.C. 2004), where the Section 75-1.1 violation was based on defendants' fraudulent misrepresentations about their intent to enter into a binding distributorship agreement.

Finally, even assuming that Defendants have concealed the true intent of their contract, Plaintiffs have failed to show how these actions proximately caused them injury, a required element of a Section 75-1.1 claim. See Boyce & Isley, PLLC, 153 N.C. App. at 35, 568 S.E.2d at 901. Defendants breached no duty to Plaintiffs in failing to disclose their alleged true purpose. Ultimately, without the NFLPA rules in place to prevent agent contact with represented players, the reason that a player terminates a terminable-at-will contract is irrelevant unless the reason itself is wrongful under some known duty.

-37-

(1986) (holding breach of promise made to fraudulently induce contract sufficient to sustain a UDTPA claim).  There is no evidence that any Defendant fraudulently induced, lied to, or forged documents in regards to Plaintiffs.

Furthermore, this court finds that any aggravating circumstances present in this case are not similar to the "substantial aggravating circumstances" identified in Kuykendall.  In Kuykendall, the non-compete agreement played a major role in the court's finding that the competitor's conduct was a Section 75-1.1 violation, as whether the defendant induced Kuykendall to breach his covenant was central to three of the four special interrogatories submitted to the jury.  See Kuykendall, 102 N.C. App. at 491-92, 403 S.E.2d at 109.  In this case, Defendants, like the defendants in Kuykendall, believed that retaining Quinn as a client would be to their economic benefit, but unlike in Kuykendall, there was nothing restricting Quinn from terminating his SRA with Plaintiffs. (See Pls.' Ex. 1, Dec. 4, 2010 SRA between Carey and Quinn (Doc. 127-1) ¶ 12 ("The term of this Agreement . . . shall remain in effect until such time that it is terminated by either party . . . .").)  Thus, Kuykendall is not instructive.

This court finds the present action is more in line with Bartolomeo, where even though the plaintiff had expended

-38-

resources based on his contract with defendants and defendants waited for months between deciding to terminate the contract and actually terminating the contract, the fact that defendants chose to terminate a terminable-at-will contract was not a Section 75-1.1 violation. Bartolomeo, 889 F.2d at 534-36; see also Dull, 85 N.C. App. at 316, 354 S.E.2d at 756 (1987). In the same way, Quinn choosing to terminate his SRA does not constitute a substantial aggravating factor, and by extension, Defendants' alleged attempts to recruit or induce Quinn to do so does not constitute a violation.

Furthermore, this case is distinguishable from Kuykendall based on the principles of agency. In Kuykendall, the defendants recruited the plaintiff's agent in order to benefit from the agent's knowledge of the plaintiff's business and the plaintiff's clients. See Kuykendall, 322 N.C. at 652-53, 370 S.E.2d at 381-82. In this case, Quinn, the person Defendants recruited, was the principal, and as a result, Quinn owed fewer duties to Plaintiffs than the agent owed to the plaintiffs in Kuykendall. See Wood v. Hutchinson Coal Co., 176 F.2d 682, 685 (4th Cir. 1949) ("[A] principal does not promise that he will not compete with his agent by contracting to pay compensation to the agent for the accomplishment of a definite result.") (citing Restatement (First) of Agency § 449 (1933)); see also

-39-

Restatement (Third) Of Agency § 8.13 (2006) ("Unless otherwise agreed, a principal is not subject to a general duty to refrain from competition with the agent that does not interfere with the agent's ability to achieve standards set by contract, which would be the counterpart to an agent's duty to refrain from competition with the principal as stated in § 8.04."). As such, inducing an agent to terminate his contract with his principal is different from inducing a principal to terminate his contract with an agent, making Kuykendall less persuasive in this case.

Additionally, that there has never been an established business relationship between Plaintiffs and Defendants supports the finding that Plaintiffs' allegation, even if accepted as true, does not constitute a Section 75-1.1 violation. See Pleasant Valley Promenade v. Lechmere, Inc., 120 N.C. App. 650, 658, 464 S.E.2d 47, 54 (1995); cf. Sunbelt Rentals, 174 N.C. App. at 59-60, 620 S.E.2d at 230-31 (finding a violation where defendants used plaintiff's own employees to solicit other key employees and eventually to persuade the entire Atlanta office to join their new venture). An established business relationship between the parties is a factor in evaluating a Section 75-1.1 claim because the statute is directed toward "maintaining ethical standards in dealings between persons engaged in business." McDonald v. Scarboro, 91 N.C. App. 13,

-40-

18, 370 S.E.2d 680, 683 (1988).  In Pleasant Valley Promenade,
the North Carolina Court of Appeals noted that the lack of a
"business relationship" between the plaintiff and one of the
defendants supported a finding of no Section 75-1.1 violation.
See Pleasant Valley Promenade, 120 N.C. App. at 658, 464 S.E.2d
at 54.  In that case, one defendant, Lechmere, leased commercial
real estate from the plaintiff, a property development company.
See id. at 654, 464 S.E.2d at 52.  During a leveraged buy-out of
Lechmere, a group including another defendant, AEW, purchased
Lechmere on the condition that Lechmere sell all of its
southeastern stores, including the one based in the plaintiff's
commercial property.  See id. at 654-55, 464 S.E.2d at 52-53.
Based on this action, the plaintiff claimed AEW induced Lechmere
to breach its lease with the plaintiff and violated Section
75-1.1.  See id. at 656, 464 S.E.2d at 53.  The trial court
disagreed, and the court of appeals affirmed that finding.  See
id. at 658, 464 S.E.2d at 54.  Because the plaintiff could not
show that AEW had an established business relationship with the
plaintiff, the plaintiff's Section 75-1.1 claim failed as a
matter of law.  See id.  Similarly, in this case, there was no
business relationship between Plaintiffs and Defendants, and
this fact supports a finding that Plaintiffs' allegations, even

if accepted as true, do not create a genuine issue as to Plaintiffs' Section 75-1.1 claim.

Finally, this court draws some guidance from the elements of tortious interference with contract under North Carolina law: "If an outsider to the contract has sufficient lawful reason for inducing the breach of contract, he is exempt from any liability [for tortious interference with contract], no matter how malicious in actuality his conduct may be." Robinson, Bradshaw & Hinson, P.A. v. Smith, 129 N.C. App. 305, 318, 498 S.E.2d 841, 851 (1998). The Supreme Court of North Carolina has recognized further that "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 220-22, 367 S.E.2d 647, 650 (1988). This court has already determined that Plaintiffs did not state a claim for tortious interference with contract because Defendants had a business justification for their actions. (Mem. Op. & Order (Doc. 41) at 23.) Although the contours of a cause of action under Section 75-1.1 and one based on tortious interference with contract are not the same, the fact that North Carolina courts excuse tort liability where a party has a legitimate business purpose suggests that

-42-

Defendants' alleged inducement does not violate established North Carolina public policy. See Pleasant Valley Promenade, 120 N.C. App. at 657-58, 464 S.E.2d at 54 ("In support of its unfair trade practices claim, Pleasant Valley first relies upon the factual allegations it asserts to support its civil conspiracy and tortious interference with contract claims. We summarily dismiss this contention . . . ."). Plaintiffs have not pointed this court to any authority that indicates North Carolina has a public policy that differs from that incorporated in this tort.

In finding that Plaintiffs' allegations do not constitute a Section 75-1.1 violation as a matter of law, this court recognizes that Plaintiffs have been injured due to Quinn's termination of his SRA with Carey. Nonetheless, those losses can and have, to a certain degree, been compensated through contract and quantum meruit actions against Quinn. (See Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss Am. Compl., Ex. A, In The Matter of Arbitration Between Carl Carey & Robert Quinn, NFLPA Case No. 12-13 (Doc. 32-1) at 30-32, 35-36.) The Fourth Circuit explained, while upholding a judgment against a plaintiff's Section 75-1.1 claim, "[i]n a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted, but

this is why remedial damages are awarded on contract claims."
United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985,
992 (4th Cir. 1981).  Therefore, the fact that Plaintiffs were
injured by Quinn's termination of the SRA and that Defendants
may have precipitated that termination to a certain extent does
not lead to the conclusion that Defendants have violated Section
75-1.1.

### iii. Defendants' Alleged Retaliatory Animus

Plaintiffs also allege that all of Defendants' acts were
motivated by a retaliatory animus toward Carey, and Plaintiffs
claim that this animus makes it more likely that the other acts
completed by Defendants were Section 75-1.1 violations.  This
court finds that Plaintiffs have not shown a genuine issue as to
Defendants' alleged retaliatory animus, and even assuming that
Defendants harbor retaliatory animus, this fact does not give
rise to a viable Section 75-1.1 claim or make it more likely
that a Section 75-1.1 violation occurred.

Plaintiffs argue that the presence of retaliatory conduct
or actions taken secretly to hurt another is indicative of and
possibly correlative with unfair and deceptive acts or
practices.  (See Pls.' Mem. (Doc. 132) at 8.)  For example, the
North Carolina Court of Appeals found a Section 75-1.1 violation
when an RV park owner turned off a resident's power in

-44-

retaliation for reporting the RV park to the local health department. Shepard v. Bonita Vista Props. L.P., 191 N.C. App. 614, 618, 664 S.E.2d 388, 392 (2008). The Shepard court found that "Defendants' acts in interfering with and disconnecting Plaintiffs' electricity were, at a minimum, unfair." Id. at 625, 604 S.E.2d at 395. Although the Shepard court did not explain the precise connection between the defendants' retaliatory conduct and its conclusion on the plaintiff's Section 75-1.1 claim, see id., this court does not disagree with Plaintiffs' argument that retaliatory conduct, under the correct circumstances, could lead to a Section 75-1.1 violation.

Plaintiffs theorize that Defendants harbor retaliatory animus based on disparaging statements that Plaintiff Carey made about Defendant Fleming, as Fleming was trying to recruit NFL player Julius Peppers in 2002. (See Pls.' Mem. (Doc. 132) at 7-8.) Defendants deny that they harbor such ill will and claim that they did not know of Carey until he initiated litigation against them. Defendants acknowledge that they were frustrated at not being able to land Julius Peppers as a client in 2002, and with Quinn terminating his SRA with Plaintiffs on the day the St. Louis Rams indicated their interest in starting contract negotiations, Plaintiffs attempt to show that Defendants were implementing a retaliatory scheme where Quinn was to extract as

-45-

much money out of Plaintiffs as possible before joining

Defendants.  (Id. at 12-13.)

However, this circumstantial evidence does not establish a

genuine dispute as to whether Defendants harbored retaliatory

animus, much less that they conspired to extract money from

Plaintiffs before Quinn terminated his SRA.  Defendants have

denied such a conspiracy, and Plaintiffs' evidence is little

more than allegations, conjecture, and speculation.  Although

this court is to give Plaintiffs the benefit of any reasonable

inferences, this court finds that the inferential leap between

the timing of Quinn's decision to terminate his relationship

with Plaintiffs and the conclusion that Defendants engaged in a

conspiracy to retaliate against Plaintiffs is so tenuous that

this court must grant summary judgment in favor of Defendants.

See <u>Textron Inc. v. Barber-Colman Co.</u>, 903 F. Supp. 1558, 1564 (W.D.N.C. 1995).[10]

Moreover, even accepting that Plaintiffs could prove retaliatory animus behind Defendants' actions, this fact is not material on its own. The cases cited by Plaintiffs involve a much more egregious retaliatory action without any legitimate business purpose. See <u>Shepard</u>, 191 N.C. App. at 618, 664 S.E.2d at 392 (recognizing that defendant told plaintiff "she would 'fix' her" after plaintiff reported defendant to the local health department). Here, there is no evidence of such

---

[10] For instance, Plaintiffs use Quinn's statement to Carey in July 2011 that "things aren't always what they seem," (Pls.' Statement of Add'l Facts (Doc. 131) ¶ 250), to allege that he was "using [Carey] as long as possible before signing with Impact Sports." (Pls.' Mem. (Doc. 132) at 13.) Then, with evidence of the meetings between Quinn and Fleming, Plaintiffs argue a reasonable juror "could conclude Quinn was instructed through Impact to extract all possible services and money from Carey until the very last moment as a retaliatory measure against Plaintiffs." (<u>Id.</u>) This court finds this connection is not adequately supported.

Plaintiffs note that the lack of text messages provided by Defendants during discovery prevented Plaintiffs from uncovering direct evidence of retaliatory animus, but Plaintiffs have directed this court to no other evidence to support this inference. Therefore, this court will not infer that, because they were not preserved, the text messages in Defendants' possession contain direct evidence of Defendants' alleged retaliatory intent. However, because Defendants did not preserve relevant text messages, this court will not consider Defendants statement that "[a]t no time did anyone associated with Impact ever discuss extracting money or services from Carey before Quinn terminated him, or harming Carey in any way . . . ." (Defs.' Reply (Doc. 137) at 5.)

egregious retaliation. Therefore, this court finds that Plaintiffs' claims of retaliation do not create a genuine issue for trial under Plaintiffs' Section 75-1.1 claim.

Finally, it should be noted that, although this court has addressed each alleged Section 75-1.1 violation individually, this court has also viewed the situation in its entirety to determine whether the complete scenario would create a Section 75-1.1 violation if the jury found all disputed facts in Plaintiffs' favor. However, again, there is simply not enough evidence to create a genuine dispute as to whether Defendants' actions have the tendency to deceive, "offend[] established public policy," or are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Tar Heel Indus., 91 N.C. App. at 56, 370 S.E.2d at 452.

Similar to the Supreme Court of North Carolina's holding in Dalton v. Camp, this court finds that Quinn's meeting with Defendants and their runners while represented by Plaintiffs and any discussion of the potential Marketing Advance during that time may be "an unfortunate circumstance," but such "business-related conduct, without more, is neither unlawful in itself . . . nor aggravating or egregious enough" to overcome the longstanding presumption that a breach of contract cannot serve as the basis for a Section 75-1.1 claim. Cf. Dalton v.

Camp, 353 N.C. 647, 658, 548 S.E.2d 704, 712 (2001).  As a
result, Defendants are entitled to summary judgment on
Plaintiffs' Section 75-1.1 claim.

### B.  Civil Conspiracy

Plaintiffs also allege that Defendants' actions constitute
a civil conspiracy.  A civil conspiracy requires: (1) an
agreement between two or more persons to do a wrongful act;
(2) an overt act committed in furtherance of the agreement; and
(3) damage to the plaintiff.  Nye v. Oates, 96 N.C. App. 343,
347, 385 S.E.2d 529, 531–532 (1989).  To show a genuine issue on
the civil conspiracy, the circumstantial evidence must amount to
more than mere suspicion or conjecture.  Dickens v. Puryear, 302
N.C. 437, 456, 276 S.E.2d 325, 337 (1981).

Here, this court does not find sufficient evidence showing
an agreement between Defendants to commit a wrongful act, as
this court has determined that there is no genuine dispute over
whether Defendants' actions constitute a Section 75-1.1
violation.  See Pleasant Valley Promenade, 120 N.C. App. at 657,
464 S.E.2d at 54.  Therefore, this court will also grant summary
judgment for Defendants on Plaintiffs' civil conspiracy claim.

### IV.  CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary
Judgment (Doc. 62) is **GRANTED** and that this case is **DISMISSED.**

-49-

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 15th day of July, 2015.

_____
United States District Judge